UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JOHN RYSZETNYK,

                Plaintiffs,

    -against-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

                Defendants.
--------------------------------------------------------------x

**MEMORANDUM & ORDER**

12-CV-2431 (SLT)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUL 0 1 2014 ★

BROOKLYN OFFICE

**TOWNES, United States District Judge:**

    Plaintiff John Ryszetnyk ("Plaintiff") commenced this action against the Commissioner of Social Security ("Commissioner") on May 16, 2012, pursuant to 42 U.S.C. §405(g), seeking judicial review of the final denial of his claim for disability insurance benefits under Title II of the Social Security Act. Presently before this Court are the parties' cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure (12)(c). For the reasons discussed below, the Commissioner's motion is denied and Plaintiff's motion is granted to the extent it seeks remand of this action. The action is remanded to the Commissioner for further proceedings in accordance with this opinion.

## BACKGROUND

    On March 2, 2010, Plaintiff filed an application with the Social Security Administration ("SSA") for Title II disability insurance benefits under the Social Security Act, alleging a disability on-set date of November 9, 2008. (Doc. No. 22, Administrative Record, June 27, 2013 ("Ar"), at 113.) The application was denied initially on June 11, 2010, (*id.* at 56.), and on June 28, 2010, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"), (*id.* at 62). The request was granted, and on August 4, 2011, Plaintiff appeared in Staten Island, New York for a hearing via Video Teleconferencing before ALJ Maria C. Northington in Mayaguez,

Puerto Rico. (*Id.* at 12.) On September 15, 2011, the ALJ issued her final decision on the matter, denying Plaintiff's claim for benefits on the grounds that he was not disabled within the meaning of the Social Security Act. (*Id.*) This action timely followed.

## A. The Evidence Before the ALJ

### 1. The Hearing

Plaintiff testified that on November 9, 2008, while helping "gut" his son's home in Long Beach, New York, approximately twenty pieces of sheetrock, weighing between 1400 and 1500 pounds, fell on his leg and "shattered" it. (Ar. at 31.) Plaintiff was rushed to the hospital by ambulance where he stayed for three days, was put on a stabilizer due to the swelling, and shortly thereafter underwent surgery where metal plates, rods, and pins were placed in his leg. (*Id.*) Plaintiff testified that he had been an investigator for Travelers Insurance Company and that his daily work activities consisted of investigating fraud, which involved taking pictures of accident scenes or property damage and interviewing people. (*Id.* at 32.) He stated that in a typical eight hour workday, his time was, on average, evenly split between sitting at his computer and standing and walking around. (*Id.* at 33.)

Plaintiff testified that since the accident, he cannot sleep, his leg constantly bothers him, and he has developed pain in his right knee and back. (*Id.*) Plaintiff told the ALJ that due to the pain, he cannot stand for any length of time and can only sit for approximately half an hour at a time before he has to move or lay down. (*Id.* at 33-34.) He testified that before the accident, he could "walk great distances" and walked on the boardwalk "every single day." (*Id.* at 34.) Plaintiff testified that, since the accident, he can only walk two blocks, with the assistance of a cane, if he's "lucky." (*Id.* at 34.) He has stopped riding a bicycle and exercising. (*Id.* at 41.) Plaintiff testified that his treating orthopedist, Dr. Steven Goodman had suggested

that the metal be removed from his left knee as a prelude to total knee replacement. (*Id.* at 35-36.) The ALJ requested that this information be provided in "black and white" directly by Dr. Goodman. (*Id.* at 36.) Plaintiff's counsel directed the ALJ to the portion of Dr. Goodman's records recommending hardware removal and a total knee replacement. (*Id.*) The ALJ stated that because she was lacking any treatment notes from 2011, the record would be left open so Plaintiff could obtain those records for her. (*Id.* at 36-37.) The ALJ additionally questioned Plaintiff about the injections he was receiving from Dr. Goodman. Specifically, she asked Plaintiff why Dr. Goodman continued administering injections when there was no significant improvement, to which Plaintiff responded that he did not know and that the injections only partially relieved his pain and only for about two weeks. (*Id.* at 37.)

Plaintiff testified that he returned to work on a limited, part-time basis after the accident in April 2009. (*Id.* at 32.) He stated that he "wanted to make an attempt" to try to go back to work, but that the pain in his leg and knee made him stop within two months, in June of 2009, at which point he had an additional left knee surgery. (*Id.*) The only other witness to testify at the hearing was vocational expert David Fasta, who had reviewed Plaintiff's employment history but never met with Plaintiff. (*Id.* at 48.) Fasta testified that Plaintiff had previously worked as a bodyguard, which was a semi-skilled position with customary exertion categorized as "light." (*Id.*) He also testified that Plaintiff's most recent position, as an insurance investigator, is considered to be a "skilled … sedentary" position. (*Id.*)

The ALJ asked Fasta to consider a hypothetical individual of the same age, education, and work experience as Plaintiff, who was capable of performing "medium exertional level work," (meaning the individual could lift or carry 50 pounds occasionally and 25 pounds frequently), had no limitations for sitting, and could stand or walk for up to six hours in an eight

hour work day. (Ar. at 49.) The ALJ clarified that, by definition, "medium work" is inclusive of the ability to perform light and sedentary work. The ALJ asked Fasta if there were any "transferrable skills from [Plaintiff's] past work." Fasta responded that Plaintiff's skillset was transferable "to other protective and security type positions." (*Id.*) Fasta testified that the hypothetical version of Plaintiff could "do past relevant work as an investigator," but that Fasta had concerns about the restraining requirements of a bodyguard position. (*Id.* at 50-51.) In addition, Fasta testified that other jobs available in the national and regional area included semi-skilled, light exertion positions like "gate guard," and "security guard." (*Id.* at 51.) When prompted by the ALJ about sedentary positions, Fasta testified that in addition to "charge account clerk," there was a "surveillance system monitor" position, but that there were no accurate statistics for such a position and he did not agree with its sedentary classification. (*Id.* at 52.) Fasta concluded that if an individual is unable to physically sustain work for eight hours a day, forty hours per week, such person would be unable to work on a "full-time consistent basis," and that there were "no jobs." (*Id.*)

### 2. Evidence from Dr. Goodman and One-On-One Physical Therapy

Dr. Goodman's records indicate that Plaintiff suffered from a left lateral tibial plateau fracture and tore his Lateral Collateral Ligament. (Ar. at 251.) As a result, he underwent a surgical open reduction internal fixation of the left lateral tibial plateau on November 21, 2008. (*Id.*) Subsequently, Plaintiff was treated at One-On-One Physical Therapy ("One-On-One") approximately three times per week between December 3, 2008 and August 5, 2009. (*Id.* at 205-265.)

On April 16, 2009, Plaintiff underwent an MRI of his left knee. (*Id.* at 341.) The MRI revealed, among other things, tearing of the posterior horn and mid zone of the medial meniscus,

a chronic sprain of the medial collateral ligament which appeared poorly healed, chondromalacia involving the medial and patellar femoral compartment with subchondral reactive signal changes, mild effusion, and a popliteal cyst. (*Id.*) At an April 30, 2009 appointment, Dr. Goodman reviewed the MRI results with Plaintiff, finding a fracture of the tibial plateau, knee pain, and tear of medial cartilage of the meniscus. (*Id.* at 195.) Based on these findings and Plaintiff's clinical symptomology, Dr. Goodman recommended additional surgical intervention. (*Id.*) On June 5, 2009, Dr. Goodman performed an arthroscopy, partial medial menisectomy and chondroplasty of the medial femoral condyle of Plaintiff's left knee. (*Id.* at 196.)

Plaintiff continued attending physical therapy at One-On-One until August 5, 2009. (*Id.* at 205-217.) He also visited Dr. Goodman regularly who administered Supartz injections to his left knee, the third of which was administered on August 20, 2009. (*Id.* at 336.) During that visit, Dr. Goodman noted that Plaintiff's range of motion included a 140 degree flexion and 0 degree extension. (*Id.*) The diagnostic assessment of Plaintiff noted a fracture of the tibial plateau, a tear of the medial cartilage or meniscus of the knee, and knee pain. (*Id.* at 337.) The records indicate that Plaintiff continued complaining of pain, but felt temporary relief after the injections. (*Id.*) Six-weeks post-injection, there was no significant improvement noted with the Supartz and he was still complaining of pain and discomfort. (*Id.* at 344.)

After a lapse in treatment, plaintiff returned to Dr. Goodman on February 16, 2010, complaining of continued intermittent discomfort in his left knee, along with occasional stiffness and swelling. (*Id.* at 342.) Dr. Goodman's report noted that Plaintiff consumed Advil and Aleve occasionally, and had been intermittently using a cane. (*Id.*) An x-ray revealed a cavity developing to the lateral tibial plateau with a slight depression. (*Id.*) Goodman also mentioned some sclerosis about the lateral joint surface and recommended hardware removal before a total

knee replacement. (*Id.* at 342-43.) Against Dr. Goodman's recommendation, Plaintiff deferred surgical intervention. (*Id.*) He returned to Dr. Goodman in August of 2010, complaining of increasing discomfort in both knees that was causing back pain. (*Id.* at 384.) Dr. Goodman noted tenderness along the lateral joint line of the left knee and along the medial joint of the right knee. (*Id.*) X-rays from this visit depicted lateral joint irregularity with sclerosis of the left knee and significant narrowing of the medial joint space of the right knee. (*Id.*) Dr. Goodman reported an impression of osteoarthritis in both of Plaintiff's knees. (*Id.*) From August of 2010 to August of 2011, Plaintiff visited Dr. Goodman for regular Supartz injections to both knees. (*See id.* 367- 384.) The remainder of these records, including x-rays, note osteoarthritis in both of Plaintiff's knees, intermittent complaints of varying degrees of pain, and a continued recommendation by Dr. Goodman for hardware removal as a prelude to total left-knee replacement. (*See Id.*)

On October 1, 2010, Dr. Goodman submitted his opinions regarding Plaintiff's injuries to the SSA in a "Medical Source Statement of Ability to Do Work-Related Activities" ("Source Statement") form. (*Id.* at 362.) Dr. Goodman noted on the Source Statement that it was his professional opinion that Plaintiff's ability to lift and carry items, stand and walk, sit, and push and pull were all affected by his impairments. (*Id.*) Additionally, he opined that Plaintiff could frequently lift less than ten pounds and occasionally lift or carry twenty pounds. (*Id.*) He concluded that Plaintiff should only stand or walk for less than two hours in an eight-hour workday, and that Plaintiff was only capable of sitting for less than six hours in an eight-hour workday. (*Id.* at 363.) Dr. Goodman was of the opinion that Plaintiff was never capable of crouching, crawling, or stooping. (*Id.*)

**3. Other Evidence**

The administrative record also consists of medical records from Dr. Publius Martins, Plaintiff's treating general practice physician. Those records – the majority of which are from before November 9, 2008 – show that Plaintiff was a healthy 6'0", 200 pound man with a history of hypertension and hyperlipidemia. (Ar. at 265-317.) Dr. Martins' records dated after November 2008 indicate that Plaintiff was recovering from a leg injury with fracture and anemia. (*Id.*)

The administrative record also includes medical records from Dr. Timothy O' Bryne, Plaintiff's treating cardiologist. Dr. O'Bryne's records from before 2008 describe Plaintiff as a healthy, well-nourished individual who, despite a history of hypertension and hyperlipidemia, exercised regularly and had no trouble sleeping. (*Id.* at 318-328.) Records from January 13, 2010 – Dr. O'Bryne's only record from after the accident – show that Plaintiff lost 10 pounds after an injury to his left-leg, and suffered from localized soft-tissue swelling of the left leg, and sporadic left leg edema. (*Id.* at 329.) The report also details a change in Plaintiff's exercise habits, stating: "poor exercise habits NOT WITH LEG." (*Id.*) (emphasis in original).

Additionally, the evidence includes records from Dr. Chitoor Govindaraj, an Internal Medicine specialist who performed a consultative analysis of Plaintiff on behalf of the Commissioner on April 27, 2010. (*Id.* at 346.) The report describes Plaintiff as a 6'3", 59-year-old male, weighing 395 pounds. (*Id.* at 347.) Dr. Govindaraj notes Plaintiff as having a normal range of motion, with normal straight leg raising and no evidence of swelling or instability. (*Id.* at 348.) Dr. Govindaraj's report states that Plaintiff's "[g]ait is grossly normal. Posture is normal. Does not need a cane for ambulation, (but the patient has it)." (*Id.*) He concludes that Plaintiff was medically stable and cleared for occupation, possessed a good overall medical

prognosis, and had a final diagnosis of "history of left leg compound fracture, treated" and "history of left knee arthroscopy." (*Id.*)

A Social Security Administration "Physical Residual Function Capacity Assessment" Form, (SSA-4734), completed by a State Agency employee after reviewing Plaintiff's records, is also in the record. (*Id.* at 350.) The SSA-4734, dated June 11, 2010, concludes that Plaintiff's statements regarding his alleged impairments are "partially credible" and that Plaintiff was capable of carrying 50 pounds occasionally and 25 pounds frequently; standing and walking for about six-hours in an eight-hour work-day; and was able to push and pull without limitation. (*Id.* at 351-54.) In the section of the SSA-4734 requesting an explanation of how the evidence reviewed supports the conclusion, the form reads: "no evidence of subluxation, contactures, ankylosis, redness, heat, or swelling" existed. (*Id.* at 351.) The form quotes Dr. Govindaraj, providing that: "Gait is grossly normal. Posture is normal . . . claimant does not need a cane for ambulation." (*Id.*) The form also cites to Dr. O'Bryne's conclusions after reviewing the results of an echocardiogram from before the accident, dated September 9, 2007, that the results "indicate an excellent exercise tolerance." (*Id.*)

## B. The ALJ's Decision

On September 15, 2011, after conducting the familiar five-step sequential evaluation process for determining whether an individual is disabled under the Act, the ALJ denied Plaintiff's claim for disability insurance benefits, finding he was not disabled "within the meaning of the Social Security Act from November 9, 2008 through the date of this decision." (Ar. at 12.) Under steps one and two, the ALJ determined that Plaintiff was not engaged in substantial gainful activity and had severe impairments. Under step three, the ALJ found Plaintiff's impairments were not of the severity that – under the regulations – met the criteria for

an immediate determination of disability. (*Id.* at 14-15.) At step four, the ALJ determined that

Plaintiff had the residual function capacity for "the full range of medium work as defined in 20

CFR 404.1567(c)," and had therefore not met his burden of proving that he was incapable of

working in his previous capacity as an insurance investigator. (*Id.* at 15.) The ALJ stated that

she had considered "all symptoms and the extent to which [they] can reasonably be accepted as

consistent with the objective medical evidence and other evidence." (*Id.*)

While the ALJ acknowledged that Plaintiff had severe impairments (in the form of "left

knee mild osteoarthritic changes with status post arthroscopy for partial medial menisectomy,

and status post tibial open reduction with internal fixation following a left leg fracture,") she

ultimately concluded that although "the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms," Plaintiff's statements concerning the

symptoms were "not credible" insofar as they were inconsistent with the residual function

capacity assessment. (*Id.* at 14- 17.) The ALJ stated:

> In terms of the claimant's alleged limitations imposed by his knee
> conditions, they are not credible to the extent that all type of work is
> precluded . . . Claimant has stated that he takes care of his personal needs,
> performs some household chores, reads for about four to five hours daily,
> uses a computer, watches television several hours a day, visits his
> children, grandchildren, and friends, plays cards, drives to church, medical
> appointments, and grocery store, rides [sic] bicycle, [goes] jogging, and
> walks long distances.

(Ar. at 17.) Additionally, the decision states that the residual function capacity assessment for

medium work was "supported by the evidence of the record as a whole," particularly by the

medical records provided by Dr. O'Byrne, Dr. Goodman, and Dr. Govindaraj, (*id.* at 18), and

that the hardware removal and knee replacement procedures were "not supported by the overall

medical evidence of record," (*id.* at 17). More specifically, the decision provided:

> [G]reat controlling weight is afforded to Dr. Steven Goodman, the
> claimant's treating orthopedist. His treatment notes evidence good
> response to treatment and a well-documented history of improvement of
> the knees condition. Great controlling weight is also afforded to Dr.
> Timothy O'Byrne, the claimant's treating cardiologist. In these records,
> the claimant is found as well developed and nourished, with a stable
> hypertension controlled with Hyzaar and Cozaar. The claimant had a
> normal echocardiogram . . . and walks from three to five miles daily.

(Ar. at 18.)

The ALJ gave great weight and credibility to Dr. Govindaraj's finding that the Plaintiff

was "stable and cleared for occupation." (*Id.*) However, the ALJ gave "no controlling weight"

to the Medical Source Statement of Dr. Goodman, as its conclusion that Plaintiff was capable of

performing light work was "contradicted by the physician's own treatment notes, as well as the

overall medical evidence, which support a residual functional capacity for medium work." (*Id.*)

The ALJ concluded her evidence summation by stating:

> [A]lthough the undersigned concurs with ... the State Agency's staff [who
> prepared the Form SSA-4734], in his or her opinion of June 11, 2010, that
> states the claimant retains the residual functional capacity for performing
> medium work, no weight can be afforded to this professional, as he or she
> is a single decision maker and not a physician.

(Ar. at 18.)

After concluding that Plaintiff was not disabled within the meaning of the Act, the ALJ

found, under step five of the five step process, that jobs existed in the national economy – gate

guard, security guard, surveillance systems monitor, stroller rental clerk – that Plaintiff would be

able to perform. (*Id.* at 19.)

## DISCUSSION

### A. Standard of Review

Judicial Review of the Commissioner's final decision is governed by 42 U.S.C. § 405(g).

Under this provision, the Court "may set aside the Commissioner's determination that a claimant

is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). Substantial evidence must be "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citations omitted); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining which of the ALJ's conclusions are supported by substantial evidence, "'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d. Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). A district court may reject the facts found by an ALJ "'only if a reasonable fact finder would have to conclude otherwise'" upon review of the record. *Brault v. Commissioner*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

## B. Standard for Determining Disability

The procedure outlined by the SSA for determining if a claimant has a disability consists of five steps. 20 C.F.R. § 404.1520. The claimant bears the burden of proof at steps one through four; at step five, the SSA bears a limited burden, but "need only show that there is work in the national economy that the claimant can do; [it] need not provide additional evidence of the claimant's residual functional capacity." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). The Second Circuit has explained that:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an

impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera*, 697 F.3d at 151 (alterations in original) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)). Any determination made by an ALJ must have been made in consideration of "(1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." *Miller v. Commissioner*, No. 13 Cv. 1648, 2013 WL 6847695, at *8 (E.D.N.Y. December 30, 2013) (quoting *Pogozelski v. Barnhart*, 03 Cv. 2914, 2004 WL 1146059, at *10 (E.D.N.Y. May 19, 2004)).

## C. The Treating Physician Rule

The ALJ must give controlling weight to the opinion of a treating physician if the opinion "is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *see also Shaw*, 221 F.3d at 134 ("[T]he medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other . . . evidence."); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) ("The SSA recognizes a . . . rule of deference to the views of the physician who has engaged in primary treatment of the claimant."). If the ALJ decides against giving the opinion of a treating physician controlling weight, various factors must be applied to decide how much weight the opinion will be given. 20 C.F.R. § 404.1527(c)(2)(i)-(ii). These factors are: "(i) the frequency of examination and the length,

nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1627(d)(2). Thus, "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

### D. Analysis

In his motion, Plaintiff claims the decision of the Commissioner was not based upon a complete and fair evaluation of the entire record and was not supported by substantial evidence. (Doc. No. 15.) As noted above, the ALJ in the instant matter concluded that Plaintiff was capable of performing "the full range of medium work as defined in 20 C.F.R. §404.1567(c)." (Ar. at 15.) This conclusion – providing, among other things, that Plaintiff had no limitations for sitting, could stand for up to six hours in an eight-hour workday and could occasionally lift and carry up to 50 pounds – was claimed to be reached after "careful consideration of the entire record." (*Id.*) The ALJ writes that the assessment is supported by Dr. Goodman's records because they demonstrate a "good response to treatment and well-documented history of improvement of the knees condition" and by Dr. Govindaraj's consultative analysis because it concludes that Plaintiff's "[g]ait and posture were normal ... and that the claimant was stable and cleared for occupation." (*Id.* at 18.) Reliance on Dr. O'Bryne's records is also discussed by the ALJ: "claimant is found as well developed and nourished" and "[follows] a low cholesterol and low salt diet, and walks from three to five miles daily." (*Id.*) Also noted were Plaintiff's statements at the hearing and in his Function Report. The ALJ determined that Plaintiff's testimony regarding his "alleged limitations" was "not credible to the extent that all type of work

13

is precluded." (*Id.* at 17.) She explained: "[T]he claimant . . . takes care of his personal needs, performs some household chores, reads for about four to five hours daily . . . rides [sic] bicycle, [g]oes jogging, and walks long distances. All of this is consistent with the [improvement] reported by [Dr.] Goodman." (*Id.*)

There are several problems with the ALJ's reasoning. First and foremost, it is unsupported by the record. The only evidence that might directly support a finding of "medium work" capability is the Form SSA-4734 Physical Residual Functional Capacity Assessment from June 11, 2010, which was afforded "no weight" because the State Agency staffer who prepared it was a "single decision maker and not a physician." (*Id.* at 18.) Nothing in any of Plaintiff's medical records from Dr. Goodman's treatment, One-On-One Physical Therapy, Dr. O'Bryne, or Dr. Martins explicitly or implicitly mentions Plaintiff's capacity to sit, stand, walk, or carry a certain amount of weight. (*Id.* at 188-386.) Moreover, the only exception to this is the Medical Source Statement prepared by Dr. Goodman, which directly contradicts a finding for medium work and instead prescribes that Plaintiff has a capacity only for light work. (*Id.* at 362-65, 18.) The ALJ attempts to dodge the findings of this report by writing:

> No controlling weight can be afforded, however, to the Medical Source Statement prepared by Dr. Steven L. Goodman on October 1, 2010. In this statement, [Dr.] Goodman rated the claimant's physical residual function capacity as able to perform light work . . . this is contradicted by the physician's own treatment notes, as well as the overall medical evidence, which support a residual functional capacity for medium work.

(Ar. at 18.)

However, the ALJ's decision not to afford controlling weight to Dr. Goodman's Medical Source Statement is problematic for several reasons. As discussed above, "failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting *Schaal v. Apfel*, 134 F.3d

496, 505 (2d Cir. 1998)). An ALJ is also required to give "'good reasons' for the weight actually given to those opinions if they are not considered controlling." *Milien v. Astrue*, 10-CV-2447 JG, 2010 WL 5232978, at *8 (E.D.N.Y. Dec. 16, 2010) (citing former 20 C.F.R. § 404.1527(d)(2) and *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). While the opinion of a treating physician may be properly denied controlling weight if inconsistent with other evidence, "not all expert opinions rise to [a] level . . . that is sufficiently substantial to undermine the opinion of [a] treating physician." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). For example, most "one-shot evaluation[s]" do not rise to the level of "substantial evidence." *Green-Younger*, 335 F.3d at 108. This is especially true when the consultant relies entirely on another expert opinion or report. *Id.*

Here, Dr. Goodman's opinion is not inconsistent with other evidence. Dr. Govindaraj saw Plaintiff only once, on the day his report was generated. (Ar. at 346.) While his report does mention that Plaintiff was "cleared for occupation," he provides no estimation for the amount of time Plaintiff may sit, stand or walk, other than to say Plaintiff's "[g]ait is grossly normal." (*Id.* at 348.) The State Agency staffer who prepared the Form SSA-4734 is not a physician and did not meet with Plaintiff in preparation of the report. (*Id.* at 355.) His conclusions mainly cite Dr. Govindaraj, and make no mention of any of the Plaintiff's physical therapy records or treating physicians' records that detail consistent pain and difficulty climbing steps and moving weight. (*Id.* at 351-52.) The only exception to this is where the Form SSA-4734 cites Dr. O'Bryne's echocardiogram and writes that Plaintiff has "an excellent exercise tolerance." (*Id.*) However, the echocardiogram was performed almost a year *prior* to Plaintiff's injury and was thus an inadequate basis for the conclusions. (*Id.* at 318.)

Also worth noting is that Dr. Govindaraj's report describes plaintiff as 6'3" and 395 pounds. (*Id.* at 347.) This finding is completely inconsistent with every other piece of medical evidence in the record and appears to miscalculate Plaintiff's height by three inches and weight by almost 200 pounds. (*Id.* at 265-332.) The Form SSA-4734's rote recitation of this finding, (which was subsequently adopted by the ALJ) after a purportedly "full" review of all medical records, demonstrates the State Agency staffer's heavy reliance on Dr. Govindaraj's consultative opinion and evinces a disregard of the medical evidence from Plaintiff's treating physicians. Accordingly, as both reports were one-shot evaluations and the Form SSA-4734 appears to rely almost entirely on Dr. Govindaraj's consultation, neither of the reports are of the compelling nature necessary to undermine the Source Statement by Plaintiff's treating physician. *See Green-Younger*, 335 F.3d at 108.

The second reason the ALJ cites for not giving the Source Statement controlling weight is its internal inconsistency with Dr. Goodman's "own treatment notes." (Ar. at 18.) However, the ALJ fails to mention where in Dr. Goodman's other treatment notes a finding supportive of a capacity for medium work is discussed. Accordingly, identifying a point of internal contradiction for the "light work" capacity is difficult. (*Id.* at 18.) While Dr. Goodman does mention improvement in pain and range of motion sporadically, the only discussion by Dr. Goodman of Plaintiff's capacity to sit, stand, walk, or carry weight is found in the statement that the ALJ is attempting to discredit. (*Id.* 367-86). Thus, the ALJ failed to provide compelling evidence, from other competent medical sources or from Dr. Goodman's own records, that would warrant exclusion of the Medical Source Statement. Accordingly, the failure by the ALJ to accord the opinion controlling weight was a violation of the Treating Physician Rule and is ground for remand.

16

Moreover, even if the ALJ had properly applied the Treating Physician Rule, the multiple factual errors made by the ALJ in summarizing Dr. Goodman's medical records lead this Court to conclude that the decision was not supported by substantial evidence and cannot stand. *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (holding that a denial of benefits not supported by substantial evidence where the ALJ committed factual errors while reviewing medical records); *Newsome v. Astrue*, 817 F. Supp. 2d 111 (E.D.N.Y. 2011) (holding a rejection of a treating physician not supported by substantial evidence because the ALJ mischaracterized the medical report). For several reasons, it appears as though the ALJ's review of Dr. Goodman's records was less than thorough.

The ALJ states in her decision that "the hardware removal and knee replacement … [were] not supported by the overall medical evidence of record." (Ar. at 17.) However the majority of Dr. Goodman's records – the records to which the ALJ gives great controlling weight – recommend those very surgeries. For example, on October 20, 2009, Goodman noted "[t]he possibilities regarding hardware in the future were discussed." (*Id.* at 381.) On February 16, 2010, Dr. Goodman wrote: "I would recommend hardware removal at a separate procedure from the total knee replacement, simply in view of the soft tissue issues." (*Id.* at 386.) Again, the treatment notes from January 11, 2011 provide: "[t]he patient will return to this office for a follow-up check unless [he] decides to proceed with surgical intervention sooner." (*Id.* at 377.) Finally, on April 15, 2011, Goodman noted "[w]hen the patient is ready, arrangement will be made for hardware removal on the left knee as a prelude to a total knee replacement." (*Id.* at 376.)

The ALJ's failure to identify medical evidence in the record regarding the need for knee surgery is particularly baffling because the ALJ was expressly made aware of this evidence

during the hearing by Plaintiff's counsel. After Plaintiff testified regarding his doctor's suggestion that he undergo a total knee replacement, the ALJ said she wanted such information in "black and white." (*Id.* at 36.) Plaintiff's counsel informed her that it was already in evidence and the ALJ went off the record briefly to find it. (*Id.*) Once back on record, she specifically stated: "Okay. So the February 2010 progress notes show that Dr. Goodman would recommend hardware removal and a separate procedure from a total knee replacement." (*Id.*) Because it appears that the ALJ's conclusions regarding Dr. Goodman are based largely on a mischaracterization of the medical records, this Court cannot conclude that the ALJ's decision was based on substantial evidence.

Additionally, even if the ALJ had properly concluded that Dr. Goodman's records were inadequate to support a finding of disability, she had an affirmative duty to seek any additional or clarifying information *sua sponte*. *Schaal*, 134 F.3d at 505; *see also Rosa*, 168 F.3d at 82-83 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history."); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y 1998) ("If an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.) Here, the ALJ perceived a clear discrepancy between Dr. Goodman's treatment notes and his source statement, yet she made no attempt to clarify the inconsistency before discrediting the opinion. If the ALJ was concerned that Dr. Goodman's functional capacity assessment contradicted his treatment notes or any other part of the record, she should have requested additional information from him in order to fill any gap or deficiency

in the record.[1] Thus, in addition to failing to state "good reasons," *Milien*, 2010 WL 5232978, at

*8 (citing 20 C.F.R. § 404.1527(d)(2) and *Halloran*, 362 F.3d at 33), for rejecting Dr.

Goodman's opinion of October 1, 2010, the ALJ also breached her duty to "'[attempt] to fill any

clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at

79.)

     Moreover, the ALJ committed errors in evaluating Plaintiff's credibility. When

evaluating residual function capacity, an ALJ is required to perform a two-pronged analysis to

assess a claimant's credibility. First, "the ALJ must decide whether the claimant suffers from a

medically determinable impairment that could reasonably be expected to produce the symptoms

alleged" and, if so, the ALJ must second "consider 'the extent to which the claimant's symptoms

can reasonably be accepted as consistent with the objective medical evidence and other

evidence' of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. §

404.1529).

     Here, the ALJ found in Plaintiff's favor on step one of the analysis, but discredited his

claims at step two, as inconsistent with the record. However, Plaintiff's complaints of constant

pain, inability to sit for more than thirty minutes, and difficulty walking long distances are

uniformly consistent with his statements throughout the claimed period of disability and with the

medical records provided by his treating physicians and physical therapists that note pain,

---

[1] The decision does note that "the record was held open for one week for submission of additional evidence, but none was received." (Ar. at 12.) Because the transcript specifically mentions the ALJ's request for Dr. Goodman's 2011 treatment notes, this Court assumes that is the additional evidence to which the ALJ was referring. (*Id.* at 37.) However, Plaintiff did indeed provide the 2011 treatment records via fax dated August 29, 2011. (*Id.* at 366-86.) Although this transmission occurred more than a week after the hearing, there is correspondence in the record that indicates a discussion between Plaintiff's counsel and the ALJ's office on August 9, 2011, regarding an extension of time to obtain records because Dr. Goodman was on vacation. (*Id.* at 110-12.)

swelling, effusion, and osteoarthritis in both knees. The facts cited by the ALJ that purportedly undermine Plaintiff's credibility – that he "rides [sic] bicycle, does [sic] jogging, and walks long distances," – are not support by record. (Ar. at 17.) Where an ALJ's "adverse credibility finding . . . was based on a misreading of the evidence" it does not comport with the ALJ's "obligation to consider 'all of the relevant medical and other evidence' and cannot stand." *Genier*, 606 F.3d at 50 (quotig 20 C.F.R. §404.1545). A cursory review of the Function Report completed by Plaintiff clearly reveals that jogging, walking long distances, and riding a bicycle were things Plaintiff claims he was able to do *before* November 2008, and alleges he has been unable to do since. (*Id.* at 157-162.) His testimony at the hearing also reveals that he participated in those activities *prior to* the accident and has been unable to exercise or ride a bicycle since. (*Id.* at 41.)

Likewise, the ALJ's reliance on Dr. O'Bryne's statement that Plaintiff "walks from three to five miles daily" is misplaced. (*Id.* at 18.) Dr. O'Bryne's report is dated September 6, 2007, more than a year before Plaintiff's fracture. (*Id.* at 318.) As noted above, the only evidence in the record from Dr. O'Bryne post-accident specifically states "poor exercise habits NOT WITH LEG." (*Id.* at 329) (emphasis in original). Accordingly, because the ALJ's determination of Plaintiff's credibility is based largely on inaccurate information, it is not supported by substantial evidence. *See, e.g.*, *Genier*, 606 F.3d 46 (remanding because the ALJ's misreading of evidence did not comply with his obligation to consider the record); *Horan v. Astrue*, 350 F. App'x 483, 484-85 (2d Cir. 2009) (summary order) (remanding because substantial evidence did not support the ALJ's decision where a credibility determination rested on a factual error).

Finally, the ALJ's conclusion that Plaintiff's brief return to work in 2009 on a part-time basis was "more consistent with the ultimate findings of [the] decision . . . than with an allegation of work-precluding activity" is belied by Plaintiff's long work history. (Ar. at 14.)

20

Although Plaintiff did return to work, he did so on a part time and limited basis. (*Id.*) As stated by the ALJ, the return "did not rise to the level of substantial gainful activity," (*id.*), and Plaintiff stopped because of pain, (*id.* at 32). "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Horan*, 350 F.App'x at 485 (holding an ALJ committed legal error in assessing a claimant's credibility by failing to consider a 25-year work history) (quoting *Rivera v. Schewieker*, 717 F.2d 719, 725 (2d Cir. 1983). Here, Plaintiff's 39-year work history with an attempt to return post-injury displays a strong motivation to work and adds to Plaintiff's credibility rather than detracts from it.

The Second Circuit has explained that where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," the court may "simply … remand for a calculation of benefits," however, where, as here, "there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court should remand "for further development of the evidence.'" *Rosa*, 168 F.3d at 82-83 (quoting *Pratts*, 94 F.3d at 39). Here, the ALJ violated the Treating Physician Rule by failing to give Dr. Goodman's Source Statement controlling weight or articulate a compelling reason not to give it such weight. The ALJ also mischaracterized much of the record, leaving the decision unsupported by substantial evidence. However, as some evidence in the record could support a finding that Plaintiff is not disabled within the meaning of the Act, Plaintiff is not entitled to an immediate remand for calculation of benefits. Further examination and development of the record is required. On remand, the ALJ should clarify the disparity between Dr. Goodman and Dr. Govindaraj's function capacity assessments, and if appropriate, seek additional clarification from Dr. Goodman regarding Plaintiff's abilities and functional capacity. Additionally, the ALJ should reassess Plaintiff's credibility in light of the entire record, including Plaintiff's work

21

history. In sum, because the Commissioner's denial was based on errors in both law and fact, and because it appears that there are significant gaps in the record, this case is remanded to the Commissioner for further review.

## CONCLUSION

For the reasons set forth above, Defendant Astrue's motion is judgment on the pleadings is DENIED, and Plaintiff Ryszetnyk's cross-motion is GRANTED to the extent it seeks remand. The action is remanded to the Commissioner for further proceedings in accordance with this opinion.

**SO ORDERED.**

s/Sandra L. Townes

/SANDRA L. TOWNES
United States District Judge

Dated: June 30, 2014
Brooklyn, New York